BRYANT LOVLIEN & JARVIS, PC
Mark G. Reinecke (OSB #914073) (reinecke@bljlawyers.com)
591 SW Mill View Way
Bend, OR 97702
Telephone: (541) 382-4331
Facsimile: (541) 389-3386

COOLEY LLP
John Hemann (CASB #165823) (jhemann@cooley.com)
(*pro hac vice forthcoming*)
Alexander Galicki (CASB #308737) (agalicki@cooley.com)
(*pro hac vice forthcoming*)
101 California Street
5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| CENTRAL OREGON COMMUNITY COLLEGE, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF VETERANS AFFAIRS; ROBERT L. WILKIE, in his official capacity as Secretary of the United States Department of Veterans Affairs; UNITED STATES DEPARTMENT OF THE TREASURY; STEVEN T. MNUCHIN, in his official capacity as Secretary of the United States Department of the Treasury; BUREAU OF THE FISCAL SERVICE, UNITED STATES DEPARTMENT OF THE TREASURY; and TIMOTHY GRIBBEN, in his official capacity as Commissioner of the Bureau of the Fiscal Service, United States Department of the Treasury, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**COMPLAINT**

## INTRODUCTION

Since 2005-06, Plaintiff Central Oregon Community College ("COCC"), a not-for-profit community college serving primarily the citizens of Deschutes, Jefferson, Crook, and portions of Klamath counties in central Oregon, has trained students to become airplane and helicopter pilots. Many such students are veterans utilizing their earned educational benefits pursuant to the Post-9/11 Veterans Educational Assistance Act of 2008, 38 U.S.C. § 3301, *et seq*, (the "Post-9/11 G.I. Bill"). Since September 2005, COCC has trained more than 220 veterans through its aviation programs. COCC serves both veterans and the country through this program, as there exists a critical need for trained pilots.

Defendant United States Department of Veterans Affairs ("VA") is responsible for overseeing the Post-9/11 GI Bill program.

Following a lengthy but incomplete compliance survey and through a series of debt collection notices sent to COCC, the VA arbitrarily and incorrectly claimed that COCC's actions caused the VA to overpay on behalf of COCC's student-veterans for flight training education. The VA is seeking reimbursement from COCC in the approximate amount of $3.2 million.

The VA's arbitrary determination that it overpaid COCC is rife with clear factual mistakes, and the so-called process the VA followed is riddled with procedural errors. COCC has specifically identified the errors in the VA's findings and repeatedly requested that the VA follow the administrative review process – the "School Liability Process" – that was created by the VA specifically to address disputes between educational institutions and the VA.

The VA has steadfastly refused to follow this required review process, and instead has continued to issue erroneous, inconsistent, and contradictory debt notices. The clear factual mistakes that the VA has made could have and should have been resolved easily through

appropriate administrative review. Instead, the VA has simply ignored COCC's requests to engage in a review process.

COCC brings this action to protect itself from the VA's arbitrary and capricious debt notices and corresponding collection efforts. The VA's refusal to provide any review process is contrary to its own regulations and leaves COCC with no option but to seek judicial intervention under the APA. COCC seeks: (1) an order requiring the VA to provide COCC with its due process rights under the School Liability Process with respect to all alleged overpayments—for tuition as well as housing and book allowances—and enjoining Defendants, and their successors and agents, from taking action to collect the alleged approximately $3.2 million (or any amount) in overpayments until the VA has met its due process obligations to COCC;[1] and (2) a declaration that the VA's conclusion that COCC owes approximately $3.2 million (or any amount) in overpayments related to its aviation programs is arbitrary, capricious, and in violation of COCC's right to due process of law.

### JURISDICTION AND VENUE

1.      Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over Plaintiff's claims arising under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the Fifth Amendment to the United States Constitution.

---

[1] By COCC initiating this action, the VA is also now subject to 31 U.S.C. § 3711 and 38 CFR § 1.910, pursuant to which the VA cannot refer COCC's purported overpayment debt to Treasury for collection because the debt is now "in litigation." 38 CFR § 1.910(b)(1); 31 U.S.C. § 3711(g)(2)(A)(i). Further, if the VA has already referred COCC's alleged overpayment debt to Treasury, Section 3711 obligates Treasury to cease any collection efforts. Should the VA or Treasury fail to comply with 31 U.S.C. § 3711 and 38 CFR § 1.910, COCC reserves its right to amend this Complaint to include violations of 31 U.S.C. § 3711 and 38 CFR § 1.910.

2.      This Court is authorized to grant the relief requested in this case pursuant to the APA, 5 U.S.C. § 706; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and the Mandamus Act, 28 U.S.C. § 1361.

3.      Venue is proper in this judicial district because Plaintiff COCC resides in this district and because a substantial part of the acts or omissions giving rise to the claims occurred and continues to occur in this judicial district.  28 U.S.C. §§ 1391(b)(2), 1391(e)(1).

## PARTIES

4.      **Plaintiff COCC** is a public community college, duly organized and established under the provisions of ORS Chapter 341, with its primary campus located in Bend, Oregon.  It is the oldest two-year college in Oregon and offers a wide range of programs that include associate degrees and technical certificates.  In part due to its receipt of federal grant money, COCC is able to offer programs that include aviation instruction for airplane and helicopter pilots, many of whom are United States military veterans.

5.      **Defendant VA** is a federal Cabinet-level agency that provides a wide range of services to eligible military veterans and their families, and is an agency within the meaning of 5 U.S.C. § 551(1).  The VA's responsibilities include overseeing veterans' education programs like the aviation courses at issue in this case.

6.      **Defendant Robert L. Wilkie** is Secretary of the VA and is sued in his official capacity.

7.      **Defendant United States Department of the Treasury** ("Treasury") is a federal Cabinet-level agency which is responsible for managing government accounts and the public debt and is an agency within the meaning of 5 U.S.C. § 551(1).

8.      **Defendant Steven T. Mnuchin** is Secretary of the Treasury and is sued in his official capacity.[2]

9.      **Defendant Bureau of Fiscal Service** ("Fiscal Service") is an institutional component of Treasury that manages a debt collection program known as the Treasury Offset Program ("TOP").[3]   TOP is a centralized program that offsets federal payments to collect delinquent non-tax debts owed to federal agencies unless exempted by federal statute or other authority.  *See* 31 U.S.C. 3716.  A wide range of federal payments are subject to offset, including federal tax returns and certain federal grant money.  *Id.*[4]

10.     **Defendant Timothy Gribben** is the Commissioner of Defendant Fiscal Service and is sued in his official capacity.

## FACTUAL ALLEGATIONS

11.     The VA's oversight of funding provided under the Post-9/11 GI Bill is governed by statute, regulations promulgated by the VA Secretary, and the VA's internal handbook, including the School Liability Process.  These authorities authorize the VA to audit COCC's aviation training program subject to specific compliance review procedures that include site visits, review of student files, and exit interviews.  The VA conducted a compliance survey of COCC's aviation training program in 2016-19 and ultimately issued three different iterations of a findings letter between 2018 to 2019, the final of which included thirty-one "findings" that purport to show COCC's program did not comply with applicable provisions of the laws administered by the VA.

---

[2]   *General Information: The Secretary*, Department of the Treasury, https://home.treasury.gov/about/general-information/the-secretary (last visited Apr. 7, 2020).
[3]   *Treasury Offset Program*, Bureau of the Fiscal Service, https://fiscal.treasury.gov/top/ (last visited Apr. 7, 2020).
[4]   *See* 31 C.F.R. § 285.5.  *See also McQueen v. Commissioner of IRS*, 2015 WL 6384686, at *2 (S.D. Ohio Oct. 22, 2015).

Subsequently, the VA has instructed COCC to repay approximately $2,900,000 in alleged tuition "overpayments."

12.     As alleged below, the VA's findings regarding tuition payments lack adequate explanation, are not supported by evidence, and are internally inconsistent. COCC has repeatedly tried to explain these issues to the VA through a series of letters, phone calls, in-person meetings, and additional documentation dating back to 2018, but the VA has refused to engage or allow COCC to challenge these findings through the School Liability Process. The VA's findings are therefore arbitrary and capricious under the Administrative Procedure Act ("APA") and they infringe upon COCC's constitutional right to due process under the Fifth Amendment.

13.     Further, separate from the tuition payments, the VA has continued its pattern of arbitrary and capricious and unconstitutional action with regard to the related housing and book allowances. On February 26, 2020 the VA issued a "revised" Notice of Intent of Referral to the Committee on School Liability dated February 26, 2020, which alleges an additional overpayment of $273,532.72 for housing and books. This was the third version of this letter the VA sent COCC in the 2018-2020 timeframe. On all three occasions, COCC requested access to the VA's School Liability Process in response to the letter, but never received a response. Although the VA acknowledges that the School Liability Process actually applies, the findings in this letter lack adequate explanation and the VA has ignored numerous requests by COCC to actually enter into the Process for this claimed overpayment.

## I.    CONGRESS PASSED THE G.I. BILLS TO PROVIDE EDUCATIONAL ASSISTANCE TO VETERANS.

14.     Starting in 1944, Congress passed the first in a series of statutes to fund educational assistance programs that allow veterans and their families to enroll in qualifying educational programs (together, the "G.I. Bills"). This case involves the most recent such legislation, the Post-

9/11 G.I. Bill, 38 U.S.C. § 3301, *et seq.*  The VA is responsible for administering and overseeing

the G.I. Bills and it has implemented regulations, guidelines, and handbooks to that end.[5]

**A.    The Post-9/11 G.I. Bill and Aviation Training Programs.**

15.    The Post-9/11 G.I. Bill was signed into law in June 2008 and became effective on

August 1, 2009. *See* Pub. L. No. 110-252, tit. V, §§ 5001-03, 122 Stat. 2357 (2008) (codified at 38

U.S.C. §§ 3301 *et seq.*).  It provides education benefits to certain veterans who served in active

military duty after September 11, 2001 or their dependents.  *See* 38 U.S.C. § 3311(a), (b).

Individuals who meet the eligibility requirements are entitled to up to 36 months of education

benefits. *See* 38 U.S.C. § 3312(a).

16.    Such education benefits include enrollment in an approved aviation degree

program, and funding options vary depending on the type of coursework and educational

institution.[6]  When a veteran is enrolled in a degree program at a public institution of higher

education like COCC, the Post-9/11 G.I. Bill provides funding up to the cost of in-state tuition

plus a monthly housing allowance and books-and-supplies stipend.[7]  That funding is disbursed

directly to the institution on behalf of the student rather than as a reimbursement to the student.

These aviation programs provide a much needed pipeline of new airplane and helicopter pilots at

a time when the aviation industry "faces chronic pilot shortages in the U.S. and around the world"

and such programs are especially popular with veteran students, many of whom have beneficial

relevant military experience.[8]

---

[5] Web Automated Reference Material System, Department of Veteran Affairs (Jul. 7, 2014), https://www.benefits.va.gov/warms/

[6] *Education and Training: Flight Training*, Department of Veteran Affairs, https://www.benefits.va.gov/gibill/flight_training.asp (last visited Apr. 7, 2020).

[7] *Post-9/11 GI Bill (Chapter 33)*, Department of Veteran Affairs, https://www.va.gov/education/about-gi-bill-benefits/post-9-11/ (last visited Apr. 7, 2020).

[8] *See* Garcia, Marisa, *Advocates Worry that Changes to GI Bill Will Make Pilot Crisis Worse,*

**B.      The VA's Oversight Role and Established Review Procedures.**

17.      The VA is responsible for administering and overseeing the G.I. Bills, including education programs for veterans under the Post-9/11 G.I. Bill.  That oversight includes approving courses and programs to receive funding, and conducting annual compliance surveys to identify "overpayments" and other deficiencies.[9]  38 U.S.C. § 3685(b) states that "an overpayment . . . [that is] the result of . . . the willful or negligent false certification by an educational institution . . . shall constitute a liability of the educational institution to the United States."  Notably, such "liabilities" do not affect the "eligibility" determination of individual veterans or eligible persons using Post-9/11 G.I. Bill benefits.  Rather, the determination regarding whether a school owes such a liability is based entirely on whether the school was "negligent" or "willful" in an alleged failure to comply with the school's regulatory obligations that are a condition of both the SAA's approval and the Memorandum of Understanding executed by the school to make online benefits certifications to VA.[10]

**1.      Approval of Courses and Programs.**

18.      The VA has established standards and processes to evaluate and approve various degree and certificate programs approved for veterans and eligible persons using their Post-9/11 G.I. Bill benefits.  There are separate requirements for accredited institutions, 38 U.S.C. § 3675,

---

Forbes        (Aug.        2,        2018,        8:18        AM),
https://www.forbes.com/sites/marisagarcia/2018/08/02/advocates-worry-that-changes-to-gi-bill-will-make-pilot-crisis-worse/#39866376d524.
[9] *See* 38 U.S.C. § 3672(a); 38 U.S.C. § 3685(b); *Answers: How may school avoid liability*, Department    of    Veterans    Affairs    (May    9,    2011,    9:06    AM), https://gibill.custhelp.va.gov/app/answers/detail/a_id/1431/kw/1431; *VA Educations Procedure Manual M22-4* ("VA Manual M22-4"), Part 10, Chapter 1 Introduction, § 1.01(a) (Jul. 25, 2017), https://www.benefits.va.gov/WARMS/M22_4.asp#j.
[10] *See Memorandum of Understanding Between The Department of Veteran Affairs and VA-ONCE*, Department        of        Veteran        Affairs, https://www.benefits.va.gov/GIBILL/resources/education_resources/mou.html (last visited Apr. 8, 2020).

and non-accredited institutions, 38 U.S.C. § 3676. Veterans may apply their benefits to aviation training offered (a) for credit toward a college degree, or (b) through a contract that provides credit toward a college degree. *See* 38 C.F.R. § 21.4263(a). In executing its duties to approve programs, the VA delegates certain responsibilities to designated state approving agencies ("SAAs"), which are selected by the chief executive of each state "for the purpose of assuming the responsibilities delegated to the State" by the VA. 38 C.F.R. § 21.4150(a). Among the responsibilities assumed by the SAA is to "[d]etermin[e] those courses which may be approved for the enrollment of veterans and eligible persons." *Id.* at § 21.4151(b)(2).

### 2.    Annual Compliance Surveys and "100 Percent Audit."

19.    The VA also monitors schools and their approved courses for compliance with all applicable provisions of the laws administered by the VA through "Annual Compliance Surveys." 38 U.S.C. § 3693. *See also* VA Manual M22-4, *supra* Part 10, Chapter 1 Introduction, §§ 1.01(a)-(b).[11] An Annual Compliance Survey requires the VA to assign an internal reviewer, who conducts a site visit to interview school personnel and students, "check classes," and review school records related to administration of the approved courses. *See id.* Part 10, Chapter 2 Compliance Surveys and Chapter 3 Procedures Applicable to all Facilities, §§ 2.01, 3.01-3.02. Generally, reviewers focus on records and materials covering the most recent academic year. *See id.* at § 3.01. Site visits require both entrance briefings (to discuss the purpose of the visit) and exit interviews (to discuss the VA's findings) with school personnel. *See id.* at §§ 3.03(a)-(b). The exit interviews in particular are designed to allow the school to rebut the VA's findings and to facilitate a discussion of appropriate corrective action. *Id.* One of several failures by the VA in this case was to provide COCC with an appropriate exit interview.

---

[11] *See also Answers: How may school avoid liability*, Department of Veterans Affair, *supra*.

20.     When a compliance survey reveals reporting or approval errors implying that a substantial pattern of overpayments may exist, the survey sample will be systematically expanded. *Id.* at Part 10, Chapter 5 Procedures Based on Number of Discrepancies Found, § 5.01. In certain cases the VA may decide to expand the survey to a 100 percent review of all records from the prior three years ("100 Percent Audit"). *Id.*

### 3.     School Liability Process and Recovery of Overpayments.

21.     In this case, the VA has not followed the process required when potential overpayments are identified. Under VA regulations, if a 100 Percent Audit "has been performed because of errors found in the initial sample of records, the results will *always* be referred to the [Education Officer[12] of the VA's Committee on School Liability] for a determination of potential liability.[13] *Id.* at Part 1, Chapter 7 School Liability, § 7.04 (emphasis added) (the "School Liability Process"). *See also id.* at Part 10, Chapter 6 Referrals, § 6.05 ("If a 100 percent audit has been performed, referral is required."). Pursuant to the agency's regulations, the Secretary of Veterans Affairs has "delegate[d] to each Committee on School Liability, and to any panel that the chairperson of the Committee may designate and draw from the Committee, the authority to find whether an educational institution is liable for an overpayment." 38 C.F.R. § 21.4009(c)(2).

22.     After an Annual Compliance Survey is referred to the Committee on School Liability, both VA regulations and the VA Manual M22-4 require the following internal review procedures:

---

[12] The relevant regulations and the VA Manual M22-4 alternatively refer to this official as the "Education Officer" or the "Adjudication Officer." In this Complaint, we will use the phrase "Education Officer."
[13] Each VA Regional Processing Office is required to establish a Committee on School Liability. *See* 38 C.F.R. § 21.4009(c)(1).

**1. Initial Decision:** The Education Officer decides whether there is evidence that would warrant a finding that a school is potentially liable for an overpayment.

**2. Notice to School:** Following each finding of potential liability, the Finance Officer will compute the potential liability and notify the school in writing of the amount and of its rights under the school liability procedures.

**3. Hearings:** A school is entitled to a prehearing conference (unless waived) and a hearing before a panel drawn from the Committee on School Liability before a decision is made as to whether it is liable for an overpayment. The Committee on School Liability will consider all evidence and testimony presented at the hearing."[14]

**4. Role of District Counsel:** The District Counsel will present VA's case at the hearing and will be present at any prehearing conference; if no hearing is requested, the District Counsel will present VA's case directly to the panel drawn from the Committee on School Liability.

**5. Committee Panel Decision and Notice to School:** The Committee Panel will make its decision based on the evidence of record and then notify the school in writing of the Committee's decision. If the educational institution is found liable for an overpayment, it also will be notified of the right to appeal the decision to the School Liability Appeals Board within 60 days from the date of the letter.

**6. Appellate Procedures:** A school may appeal an adverse decision to the School Liability Appeals Board in Washington, DC. The Appeals Board may affirm, modify or reverse a decision of the Committee on School Liability or may remand an appeal for further consideration by the appropriate Committee on School Liability.

**7. Finality of Decisions:** The VA's regulations note that "[t]here is no right of additional administrative appeal of a decision of the School Liability Appeals Board."

*See* 38 C.F.R. § 21.4009. *See also* VA Manual M22-4, Part 1, Chapter 7 School Liability.

---

[14] The VA Manual M22-4 also specifies that the panel is to be made up of three persons, and that the school "may challenge the qualifications of proposed panel members." VA Manual M22-4, Part 1, Chapter 7 School Liability, § 7.03.

II.    **THE VA DID NOT FOLLOW ITS OWN REQUIRED PROCEDURES IN ITS REVIEW OF COCC'S AVIATION TRAINING PROGRAM AND ITS EFFORTS TO ASSESS AND COLLECT THE RESULTING CLAIMED OVERPAYMENTS.**

A.    **COCC's Aviation Training Program From 2009 to 2017.**

23.    In order to allow its student-veterans to take advantage of the Post-9/11 G.I. Bill, COCC began offering aviation training programs in September 2005 after the SAA approved COCC's proposed courses for airplane and helicopter training.  COCC continues to offer these courses.[15]  COCC has trained more than 220 student veterans to become pilots since COCC started its aviation training programs and graduates have routinely obtained jobs as pilots at top U.S. airlines, such as Horizon Airlines, and SkyWest Airlines, at important commuter airlines like RAVN Alaska, and as helicopter pilots in the defense, medical, oil and gas, and tourism industries. *PBS NewsHour* recently recognized COCC's aviation training programs for their successes in a feature program.  Moreover, Oregon's congressional delegation has recognized the contributions of COCC and other Oregon community college aviation programs to local communities by their ongoing support and willingness to advocate for COCC and other colleges before the Secretary of the VA in relation to the alleged overpayments that are the subject of this lawsuit.  (Ex. 2, at 3-4.) COCC has a strong national reputation for its high-quality and affordable aviation programs, demonstrated by the number of students from across the United States who move to Central Oregon each year to enroll in COCC's aviation programs.

---

[15] The SAA suspended COCC's approvals for new enrollments in three aviation programs in April 2017.  The suspension was rescinded in October 2017, and COCC continued enrolling new students in those programs shortly thereafter.  COCC continued offering the programs to enrolled students during the period of suspension without issue.

**B.    Starting in 2017, the Administration Tried to Cut Veterans' Benefits for Aviation Training Programs.**

24.    In May 2017, the White House released its proposed budget for fiscal year 2018, which sought to impose various cost-saving proposals at the VA (even while increasing the VA's overall funding).[16] One such cost-cutting proposal targeted aviation training programs under the Post-9/11 G.I. Bill, which the Administration predicted would save a total of $42 million annually.[17] However, the Administration could not secure Congressional support to cut aviation training programs, and that element of its proposed 2018 budget was not included in the final budget that Congress ultimately passed in October 2017.[18] The Administration has continued to press Congress for similar cuts to aviation training programs for veterans without success.[19]

**C.    The VA's 2016-17 Annual Compliance Survey of COCC's Aviation Training Program.**

25.    In June 2017, one month after the Administration's proposed budget cuts to aviation training programs for veterans, an Education Compliance Survey Specialist ("CSS") from the VA's Muskogee office notified COCC that she was taking over the school's ongoing Annual Compliance Survey. In July 2017, the CSS informed COCC that the VA had identified certain compliance issues and was expanding the review to a 100 Percent Audit that would cover academic years from fall 2015 to spring 2017. The CSS asked COCC to provide a complete set of records covering those three years, and COCC provided a total of 254 student records by December 21,

---

[16] Shane, Leo, *Trump's big VA budget request comes with proposed trims to veterans benefits*, Rebootcamp.MilitaryTimes.com (May 23, 2017), https://rebootcamp.militarytimes.com/news/pentagon-congress/2017/05/23/trump-s-big-va-budget-request-comes-with-proposed-trims-to-veterans-benefits/.

[17] *Id.*

[18] Ferris, Sarah, *Senate budget, clearing path for tax reform*, Politico (Oct. 19, 2017), https://www.politico.com/story/2017/10/19/senate-budget-tax-overhaul-vote-a-rama-243963.

[19] Wentling, Nikki, *Trump's budget request seeks another increase in VA funding*, Stars and Stripes (Mar. 11, 2019), https://www.stripes.com/news/us/trump-s-budget-request-seeks-another-increase-in-va-funding-1.572205.

2017. The VA apparently conducted an audit based on these records, but at no point during this Annual Compliance Survey or 100 Percent Audit did the VA conduct an exit interview of COCC personnel. The failure to conduct an exit interview, which is part of the normal compliance survey process, resulted in numerous errors in the VA's survey findings that easily could have been corrected.

**D.    In January 2018, the VA Issued its Annual Compliance Survey Findings and Denied COCC Access to the School Liability Process.**

26.    On January 17, 2018, COCC received a letter from the VA setting forth its Annual Compliance Survey findings (the "2018 Letter," Ex. 1, at 1). The 2018 Letter explains that the VA had identified four categories of violations regarding COCC's aviation training program spanning 2014-17, all of which were inaccurate and mistaken. Moreover, the 2018 Letter is a scant two pages and provides only a few short explanations that are plainly inadequate to put COCC on notice of the alleged underlying violations. (*Id.* at 1 (e.g., "Your school failed to meet the requirements in twenty-five out of two hundred fifty-four records reviewed.")). The letter does not specify the overpayment amount, *id.*, but the VA later informed COCC on a conference call that it owed $3.9 million as a result of the supposed violations. (*Id.*) Contrary to VA regulations and the VA Manual, the VA's Finance Officer did not proceed to compute COCC's potential liability or notify the school of its rights under the School Liability Process. *See* 38 C.F.R. § 21.4009; VA Manual M22-4, Part 1, Chapter 7 School Liability, § 7.03. Further, the VA did not inform COCC that any committee on school liability had been formed, nor was COCC given an opportunity to challenge the qualifications of the proposed panel members, to attend a prehearing conference and hearing, or to receive a panel decision with notice. *See* 38 C.F.R. § 21.4009; VA Manual M22-4, Part 1, Chapter 7 School Liability, § 7.03.

27.     Instead, starting on January 26, 2018, COCC began receiving debt notices for individual students from the VA's Debt Management Center ("DMC").  COCC was concerned about its lack of process and sent an email to the CSS asking for an exit interview and access to the School Liability Process.  The CSS responded by incorrectly stating that the VA had provided several exit interviews, and asserting that COCC should expect to hear from the VA to initiate the School Liability Process.  The CSS further instructed COCC to abstain from taking action and to "[t]ake no action at this time regarding these letters." She further explained that "[o]nce all the records have been processed by adjudication, you will be contacted by VA's finance department for the next step."[20]  COCC did not, in fact, receive any additional communication from the VA's finance department or anyone associated with the School Liability Process.

28.     In an effort to get some resolution to this frustrating experience, COCC reached out to its local representatives in Congress.  In March 2018, the Oregon Congressional Delegation wrote a letter to David Shulkin, then-United States Secretary of Veterans Affairs, expressing concerns about the VA's failure to give COCC and other Oregon colleges their due process in connection with the VA's compliance surveys of their respective aviation training programs.  (Ex. 2 at 3-4)  The delegation asked Secretary Shulkin to suspend all debt collection activities until COCC and the other schools received that process.  In response, Defendant Robert L. Wilkie wrote to the delegation on May 16, 2018, stating that none of the schools (including COCC) had yet been "found liable for student debts or related fees through the school liability process outlined in 38 Code of Federal Regulations 21.4009," and that "[a]t present, no debts are being collected from

---

[20] Note that the second step in the School Liability Process is for the Finance Officer to "compute the potential liability and notify the school in writing of the amount and of its rights under the school liability procedures." 38 C.F.R. § 21.4009. *See also* VA Manual M22-4, Part 1, Chapter 7 School Liability; *supra* Section (B)(1)(c).

the schools, and the VA has not yet [sic] to make any findings of school liability." ("Wilkie Letter," Ex. 3, at 6-7.) These statements are contrary to the January 17, 2018, letter and subsequent debt notices the VA sent to COCC.

29.     Despite Defendant Wilkie's assurances, COCC was never contacted by the Committee on School Liability. Instead, the VA continued to subject COCC to an illegal and *ad hoc* review process. Contrary to the requirements of the School Liability Process, the VA advised COCC that the VA would suspend all debt collection for 90 days starting March 22, 2018, pending COCC's filing disputes on a per student basis. In an effort to avoid imminent debt collection from Treasury, COCC complied and lodged individual disputes with the DMC from April 20, 2018, through June 14, 2018. COCC never received any substantive response and was not provided with any process in which to resolve the errors in the debt notices.

### E.     In January 2019, the VA Issued Additional Annual Compliance Survey Findings and Again Denied COCC Access to the School Liability Process.

30.     On January 24, 2019, the VA sent COCC a new letter regarding the VA's review of 2014-17 records (the "2019 Letter," Ex. 4 at 8), which purports to supersede the 2018 Letter. The 2019 Letter again identifies four categories of violations regarding COCC's aviation training program, but also attaches a "[d]etailed findings report of the compliance survey."[21] The findings, while still erroneous, were not adequately explained. The attached report set forth 31 findings broken out by category, but dedicated at best a few cursory sentences to each finding. (*Id.* at 11-15.) The letter stated that COCC's previous disputes relating to 194 student records in response to the 2018 Letter had been received and denied (again, without going through the required School Liability Process or providing an exit interview), and that findings for one additional student in the

---

[21] The attached findings report has been redacted in certain places to protect veteran students' personal identifying information.

2019 Letter were new.[22] (*Id.*) The 2019 Letter did not specifically state the total amount owed, nor does it contain any reference to the School Liability Process. (*Id.*) The VA did not provide any information at all regarding how the amounts allegedly owed are broken out by finding, or how the facts of any individual student file correspond to a finding that allegedly results in liability. (*Id.*) The VA has further refused to provide any explanation for how the liability amounts were reached except to state on a June 26, 2018 conference call that they used "simple math." Further, the findings set forth in the 2019 Letter contain clear errors, factual impossibilities, and internal inconsistencies that would have been resolved had the VA engaged in a good faith, thorough exit interview process followed by the School Liability Process.

31.     For example, a number of the findings have no factual support whatsoever based on a review of the factual record. For Finding No. 9, the VA concluded that for 15 students, COCC "failed to provide VA with flight logs and/or contractor invoices for the flight labs they certified" for fifteen different students. (*Id.* at 12.) However, the evidence before the VA reflects that COCC provided all requested records for all students. Similarly, for Finding No. 12, the VA concluded that for 97 students, third-party invoices listed students as instructors, and some listed students as their own instructors. (*Id.*) However, a review of the files at issue that were before the VA shows that no student was listed as their own instructor. In fact, seventy-seven of the files reviewed were for students who never worked as instructors at COCC, making it impossible for their names to show as the instructor on invoices.[23]

32.     COCC engaged the VA further via letters and phone calls asking for some process to challenge the VA's mistaken findings. The VA refused to give COCC access to the School

---

[22] The 2019 Letter thus set forth findings for 195 students.
[23] Finding 12 does not specify how many students the VA concluded were listed as their own instructors. However, none of the invoices for the 97 students referenced in Finding 12 identify any student as their own instructor.

Liability Process, and instead the VA's DMC informed COCC on November 22, 2019, that the thirty-one findings would be enforced and debt collection would resume in thirty days. However, COCC continued to receive debt notices, which offered COCC an opportunity to file disputes for each. COCC filed individual dispute notices and then responded to the DMC on December 3, 2019, with a detailed letter explaining why each of the thirty-one findings were inaccurate and mistaken. (Ex. 5, at 220.)[24] That December 3, 2019 letter is the most comprehensive document in the record explaining why each of the VA's findings are wrong. COCC received a cursory response from the DMC on January 17, 2020, stating that COCC's debt would be referred to Treasury for collection without any opportunity to dispute it. (Ex. 6, at 235)

33.    Then on January 22, 2020, the VA sent another letter instructing COCC to remit $971,844.53 in overpayments to the VA. (Ex. 7, at 236-38.) This figure was inconsistent with the attachment to the letter, which suggested that COCC owed roughly $2,900,000. (*Id.* at 238-43)[25] When COCC followed up to ask about that discrepancy, the VA clarified that this was an error and COCC actually owed $2,969,581.13 to the VA in overpayments. Like the 2018 and 2019 Letters, the VA's explanations in the January 17 and 22, 2020 Letters are plainly inadequate. The January 17 Letter simply lists the debt amount owed for each student. *See* January 17 Letter. Likewise, the January 22 Letter only states that COCC's debt would be referred to Treasury for collection without any opportunity to dispute it. *See* January 22 Letter.

---

[24] COCC's December 3, 2019 letter to the DMC has been redacted in certain places to protect veteran students' personal identifying information.

[25] This attachment has been redacted in certain places to protect veteran students' personal identifying information.

**F.      The VA Issued a Separate Overpayment Notice for Housing and Book
          Allowances and Offered but then Ignored COCC's Requests for the School
          Liability Process.**

34.      Separately, on November 30, 2018, the Director of the VA's Muskogee Office, sent

a notice of intent of referral to the Committee on School Liability alleging there was an additional

$292,922.72 of alleged overpayments for student housing allowance payments that COCC would

also have to repay.  (Ex. 8, at 244.)  Unlike with respect to the alleged tuition overpayments

discussed above, the letter required COCC to reply within 30 days by paying, offering rebuttal

evidence, or requesting a hearing under the School Liability Process.  COCC responded on

December 20, 2018 seeking clarification.  No one from the VA ever responded to that email.

COCC sent a second email to the VA on December 21 requesting a pre-hearing conference as

offered; COCC never received a substantive response from the VA.

35.      One year later, COCC received a second Housing and Book Allowance notification,

dated December 4, 2019, explaining that the matter had been referred to the Committee on School

Liability.  (Ex. 9, at 246.)  Pursuant to VA regulations, COCC again requested a pre-hearing

conference.  The Director of the Muskogee office responded that he received the request and that

he would be in contact with further details.  Despite repeated follow-ups by COCC, COCC never

received a response.

36.      Eventually, COCC received a third Housing and Book Allowance notification in

February 2020 that – without explanation – claimed COCC owed an entirely different overpayment

sum.  ("2020 Housing and Book Notice," Ex. 10 at 248.)[26]  COCC, for the third time, requested a

pre-hearing conference under the School Liability Process (Ex. 11 at 254) but, to date, has not yet

received a response.

---

[26] The attachment to the 2020 Housing and Book Notice has been redacted in certain places to
protect veteran students' personal identifying information.

37.    The VA's acknowledgement that the School Liability Process applies with regard to the housing and book allowance notification is at direct odds with its refusal to acknowledge the same with regard to the tuition allowance notifications, and reveals that its position with regarding to the tuition disputes is arbitrary and capricious.  At the same time, its acknowledgment that the School Liability Process applies to the housing and book allowance notification, but its refusal to actually engage in that process despite repeated requests is likewise arbitrary and capricious.

### III.    THE VA HAS CONCEDED THAT IT MADE MISTAKES AND FAILED TO GIVE COCC DUE PROCESS OR A MEANINGFUL CHANCE FOR REVIEW; NONETHELESS, VA HAS REFUSED TO RESPOND TO COCC'S GOOD FAITH EFFORTS TO RESOLVE THIS MATTER.

38.    COCC's frustration with the VA's refusal to correct its obvious errors and failure to give COCC access to the School Liability Process has been compounded by the VA's repeated admissions that it has mishandled this process.  First, during the exit interview for a separate September 2019 VA Compliance Survey for *non-aviation programs*, a member of the VA staff told COCC staff the following regarding the Annual Compliance Survey for aviation programs: (1) "You should always have an exit interview … it is standard practice," (2) "I know you were upset about how it [referring to the aviation compliance survey] went last time – and it should have not gone that way," and (3) "[y]ou still have three shelves of files here [referring to Muskogee]. You were part of a couple of schools that were not worked correctly before."[27]

39.    Second, the VA has never cited regulations or instituted a rule-making process for new guidance.  Instead, the VA has cited to what, at best, could be termed "informal guidance" contained in PowerPoint slide decks, webinars, or other informal mediums.  Indeed, since 2015, these have been the VA's preferred methods to communicate its guidance to Institutions of Higher

---

[27] COCC understood the VA's statement that the Annual Compliance Survey for aviation programs was "not worked correctly before" to mean that it was not handled properly.

Learning.  The VA has never specifically identified an applicable statutory or regulatory violation to support their findings.  Further, the VA has not even provided a finding-by-finding break down of its alleged liabilities and has admitted it cannot do so, presumably because the VA used an alternative, and otherwise undisclosed, method to arrive at COCC's purported liability.  According to a member of the compliance and liaison staff at the Muskogee office, the VA "just applied some simple math."

40.    Third, when confronted with the various process failures and factual errors, the Executive Director of Education Services, Veterans Benefits Administration, informed COCC that she could not do anything about the regulations or process used during COCC's compliance survey as "they did not occur on [her] watch."

41.    Before turning to the courts for relief, on March 13, 2020, COCC (through its outside counsel) sent the VA a letter offering the VA another opportunity to discuss entering into the legitimate process to resolve those disputes through a proper exit interview and, to the extent necessary, the School Liability Process.  ("March 2020 Letter," Ex. 12, at 256-58).  As of the date of this filing, COCC has not received any response, nor even an acknowledgement of receipt, to the March 2020 Letter.

## FIRST CLAIM FOR RELIEF
### Administrative Procedure Act—Arbitrary and Capricious

42.    Plaintiff incorporates Paragraphs 1 through 41 above.

43.    The Administrative Procedure Act, 5 U.S.C. § 706, authorizes this court to set aside and hold unlawful agency action that is arbitrary and capricious, including when an agency adopts a course of action that is contrary to its own regulations.

44.    The VA's conclusion that COCC owes approximately $3.2 million (or any amount) in overpayments related to its aviation programs was reached in contravention of its own regulations.

45.    In administering the G.I. Bills and assessing and collecting overpayments under 38 U.S. Code § 3685, the VA is bound by its own regulations at 38 C.F.R. 21.4009.

46.    Pursuant to 38 C.F.R. 21.4009, the VA may not hold a school liable for a supposed overpayment before the case is referred to the VA's Committee on School Liability. *Id.* The Secretary of Veterans Affairs has "delegate[d] to each Committee on School Liability, and to any panel that the chairperson of the Committee may designate and draw from the Committee, the authority to find whether an educational institution is liable for an overpayment." *Id.*

47.    The School Liability Process is designed to identify and reverse the kinds of blatant mistakes found in the 2019 Letter so that institutions like COCC are provided due process of law before their alleged overpayment debt is assessed and transferred to the Treasury Department for collection. That process is supposed to include a number of procedural steps.

48.    First, the Education Officer will "decide whether there is evidence that would warrant a finding that an educational institution is potentially liable for an overpayment." 38 C.F.R. § 21.4009. Second, after any finding of potential liability, the Finance Officer will compute the potential liability and notify the school in writing of the amount and of its rights under the school liability procedures. *Id.* Third, the school is then entitled to a prehearing conference (unless waived) and a hearing before a panel drawn from the Committee on School Liability before a decision is made on liability for an overpayment. *Id.* Fourth, the Committee Panel will make its decision based on the evidence of record, and notify the school of its decision in writing; if found liable for an overpayment, the school will also be notified of its right to appeal the decision to the

School Liability Appeals Board within 60 days.  *Id.*  Fifth, the school has the right to appeal any adverse finding of overpayment liability to the School Liability Appeals Board, which may "affirm, modify or reverse a decision of the Committee on School Liability or may remand an appeal for further consideration by the appropriate Committee on School Liability."  *Id.*

49.    Here, for the alleged tuition overpayments, the VA denied COCC each and every one of these procedural rights, despite numerous promises to the contrary by VA officials, including Defendant Wilkie.  For example, COCC never received notification from the Finance Officer with a computation of the amount of potential liability, nor did it receive information about its rights under the school liability procedures.  COCC also was denied a prehearing conference and a hearing before a panel drawn from the Committee on School Liability.  Further, COCC did not receive a final decision from the Committee Panel in writing, a notification that it could appeal the decision to the School Liability Appeals Board, or any opportunity whatsoever to appeal the VA's mistaken findings to any panel or neutral body.  Instead, the VA implemented a dysfunctional, inconsistent, *ad hoc* approach without any procedural safeguards.

50.    After COCC repeatedly informed the VA that it was entitled to process under the School Liability Process, the VA refused to implement that process for alleged tuition overpayments.  However, the VA did acknowledge correctly that that process applied as to the alleged housing and book overpayments.  This inconsistency demonstrates that the VA knows and understands that it should have implemented the School Liability Process with regard to all of the alleged overpayments.

51.    For the alleged housing and book overpayments, the VA subsequently denied COCC its rights under the School Liability Process, with the exception of the first and the second steps.  As required, the Finance Officer computed COCC's potential liability for housing and book

overpayments and notified COCC in writing of the amount and of its rights under the school liability procedures. However, when COCC exercised its rights to the School Liability Process by requesting a pre-hearing conference, the VA never responded to COCC. Indeed, COCC never received a pre-hearing conference, a hearing, or any of its other rights under the School Liability Process for the alleged housing and book debts.

52.     Accordingly, all of the VA's findings resulting from that process are arbitrary and capricious, contrary to its own regulations, and must be set aside.

53.     As a result of the VA's conduct, COCC has suffered and will continue to suffer irreparable injury.

**SECOND CLAIM FOR RELIEF**
**Administrative Procedure Act—Unconstitutional Action Under the Due Process Clause**

54.     Plaintiff incorporates Paragraphs 1 through 53 above.

55.     Under the Due Process Clause of the Fifth Amendment, the government may not deprive COCC of a protected property or liberty interest without due process of law.

56.     COCC has a constitutionally protected property interest in Post-9/11 G.I. Bill funding that it has already received and has *properly spent* on tuition for aviation training, and housing and book allowances for veterans.

57.     The VA has also stated that it will refer approximately $2.9 million in alleged tuition overpayments to Treasury, which Treasury may seek to garnish. COCC also has a constitutionally protected property interest not only in its tax refund, but also in other properly allocated federal funding that Treasury may seek to garnish, including: (1) funding under the Small Business Administration for COCC's Small Business Development Center; (2) U.S. Department of Education grants for strengthening institutions under Title III; (3) WIOA Title II Adult Basic

Education federal funding; (4) approximately $150,000 in Perkins funding used to purchase career and technical education program equipment needs.

58.     The process by which the VA concluded that COCC owes approximately $3.2 million (or any amount) in tuition and housing and book allowance overpayments is unconstitutional because it did not afford COCC with the due process required by the Fifth Amendment to the United States Constitution.    The VA did not provide COCC with any evidentiary hearing or access to agency appellate review.    If COCC had access to procedures to trigger a review, some responsible person or panel would have evaluated COCC's file and reached the only reasonable conclusion: that the VA's findings are inaccurate and must be set aside. Requiring the VA to give COCC additional procedural safeguards would not impose additional fiscal or administrative burdens on the VA.    COCC simply seeks the procedures that the VA promulgated itself and is obligated to provide.    *See* 38 C.F.R. § 21.4009.

59.     As a result of the VA's conduct, COCC has suffered and will continue to suffer irreparable injury.

### THIRD CLAIM FOR RELIEF
### Administrative Procedure Act—Arbitrary and Capricious

60.     Plaintiff incorporates Paragraphs 1 through 59 above.

61.     The Administrative Procedure Act, 5 U.S.C. § 706(2)(A), authorizes this court to set aside and hold unlawful agency action that is arbitrary and capricious.

62.     Here, all of the findings in the 2018 and 2019 Letters—including each of the VA's thirty-one findings in the 2019 Letter—as well as the January 17 and 22 Letters, fail to provide an adequate explanation for the VA's findings.    Further, the explanations set forth in 2020 Housing and Book Notice are likewise inadequate.    An agency's findings must be accompanied by an adequate explanation, *see FEC v. Rose*, 806 F.2d at 1088, "including a 'rational connection

between the facts found and the choice made,'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The agency must be able to provide the "essential facts upon which the administrative decision was based" and explain what justifies the determination with actual evidence beyond a "conclusory statement." *United States v. Dierckman*, 201 F.3d 915, 926 (7th Cir. 2000) (quoting *Bagdonas v. Dep't of the Treasury*, 93 F.3d 422, 426 (7th Cir. 1996)).  All of the findings in the 2018 and 2019 Letters, the January 17 and 22 Letters, and the housing and book overpayment notices fail to meet this standard, and as such, should be set aside.

63.    Many of the findings in the 2019 Letter are also arbitrary and capricious because they do not meet the "substantial evidence" test. *See ASSE Intern., Inc. v. Kerry*, 803 F.3d at 1072. *See also Bonnichsen v. United States,* 367 F.3d at 880 n. 19 ("Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").  No "reasonable mind" would accept the VA's total lack of evidence for these findings "as adequate to support [its] conclusion." *Id.*  These findings have no factual support whatsoever, which is obvious upon a cursory review of the factual record.  These findings must be set aside under the APA as arbitrary and capricious for this additional reason.

64.    Finally, certain findings in the 2019 Letter are internally inconsistent, and are therefore arbitrary and capricious under the APA.  It is well-established that the VA's "actions must also be consistent; an internally inconsistent analysis is arbitrary and capricious." *National Parks Conservation Ass'n v. E.P.A.*, 788 F.3d 1134, 1141 (9th Cir. 2015) (citing *Gen. Chem. Corp. v. United States,* 817 F.2d 844, 857 (D.C. Cir.1987) (per curiam)).  These findings must be set aside for this additional reason.

65.     Thus, the VA's ultimate determination that COCC owes approximately $3.2 million (or any amount) in overpayments must be set aside. *See* 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that this Court

1.     Order the VA to provide COCC with its due process rights under the School Liability Process with respect to all alleged overpayments—for tuition as well as housing and book allowances—and enjoin Defendants, and their successors and agents, from collecting the alleged approximately $3.2 million (or any amount) in overpayments until the VA has met its due process obligations to COCC.

2.     Declare that Defendants' conclusion that COCC owes approximately $3.2 million (or any amount) in overpayments related to its aviation programs was arbitrary and capricious and in violation of COCC's right to due process of law under the Fifth Amendment to the United States Constitution.

3.     Such other and further relief as this Court may deem just and proper.

Dated:    April 10, 2020

Respectfully submitted,

BRYANT LOVLIEN & JARVIS, PC

*/s/ Mark G. Reinecke*
_____

MARK G. REINECKE (OSB #914073)
(reinecke@bljlawyers.com)
591 SW Mill View Way
Bend, OR 97702
Telephone:  (541) 382-4331
Facsimile:  (541) 389-3386

COOLEY LLP
John Hemann (CASB #165823)
(jhemann@cooley.com) (*pro hac vice
forthcoming*)
Alexander Galicki (CASB #308737)
(agalicki@cooley.com)
(*pro hac vice forthcoming*)
101 California Street
5th Floor
San Francisco, CA  94111-5800
Telephone:  (415) 693-2000
Facsimile:  (415) 693-2222

Attorneys for Plaintiff